751 A.2d 564 (1999)
331 N.J. Super. 134
Ronald J. CAVANAUGH, Plaintiff-Respondent,
v.
SKIL CORPORATION, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 1999.
Decided July 9, 1999.
*568 Joseph DiRienzo, Sr. and Joseph DiRienzo, Jr., Fanwood, for defendant-appellant (DiRienzo & Wallerstein, attorneys; Mr. DiRienzo, Sr. and Mr. DiRienzo, Jr., on the brief).
Bruce H. Zamost, Moorestown, for plaintiff-respondent (Colton, Stein & Zamost, attorneys; Mr. Zamost, on the brief).
Eric J. Ludwig, Lawrenceville, for amicus curiae The Association of Trial Lawyers of AmericaNew Jersey (Stark & Stark, attorneys; Mr. Ludwig and Michael G. Donahue, on the brief).
Herrick, Feinstein, Princeton, for amicus curiae Product Liability Advisory Council, Inc. (Hugh F. Young, Jr., of the Virginia Bar, Reston, VA, of counsel; Ronald J. Levine, Hackensack and Patrick E. Bradley, New York City, on the brief).
Before Judges KING, WALLACE and NEWMAN. *565 *566
*567 The opinion of the court was delivered by KING, P.J.A.D.

I
Defendant Skil Corporation appeals a $200,155.20 judgment entered upon a jury verdict in this product liability case. Plaintiff, a carpenter, lost one toe and severely damaged another after he had placed down a Skilsaw portable circular saw which "travelled" eighteen inches across the subfloor of a house that plaintiff was framing and ran over his right foot.
Defendant seeks reversal of the judgment and a new trial on several grounds. Defendant contends the trial judge committed reversible error when he (1) charged the jury on the state-of-the-art defense, over defendant's objection; (2) gave a jury charge on the state-of-the-art defense, which improperly shifted the burden of proof to defendant; (3) permitted plaintiff to offer evidence of post-accident use of the saw though plaintiff had failed to disclose this evidence in discovery; (4) permitted plaintiff to offer evidence and make arguments that defendant's conduct was a basis for imposing liability; (5) permitted plaintiff to cross-examine defendant's expert by asking questions that had no good-faith factual basis; and (6) denied defendant's motion for judgment at the close of all the evidence.
Defendant also contends, for a number of reasons, that we should "overrule" Tirrell v. Navistar Intern., Inc., 248 N.J.Super. 390, 591 A.2d 643 (App.Div.), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991), order a new trial, and permit defendant to assert the comparative negligence defense. The propriety of Tirrell is also the subject of briefs submitted by the amici curiae. We find no reversible error and affirm.

*569 II
On January 3, 1992 plaintiff filed a two-count complaint in the Superior Court, Law Division, Burlington County. The complaint sought compensatory and punitive damages from defendant and John Does 1 through 20 for injuries plaintiff sustained while using a Skilsaw portable circular saw (Skilsaw) during the course of his employment as a carpenter. The Skilsaw was manufactured by defendant.
The first count alleged that (1) defendant negligently designed, manufactured, assembled, produced, tested, inspected, distributed, marketed, leased or sold the Skilsaw and negligently failed to properly instruct or warn plaintiff about its use; and (2) the Skilsaw was defective in its design, manufacture and lack of proper instructions and warnings. The second count alleged that John Does 1 through 20 "failed and neglected to take any action to guard workers, such as plaintiff ... against dangers posed by the hazardous condition" of the Skilsaw.
The motion judge granted defendant's motion to dismiss plaintiff's punitive damages claim with prejudice and his motion in limine to bar defendant from using the comparative negligence defense.
During the seven-day jury trial before Judge Bookbinder and a jury in December 1996 plaintiff's theory of liability was design defect only. On December 11, 1996 the jury found that the Skilsaw was defectively designed and that the design defect was a proximate cause of plaintiff's injuries. The jury awarded plaintiff $160,000 in damages. On January 8, 1997 the award, plus prejudgment interest, was reduced to judgment in the amount of $200,155.20.

III
On February 14, 1990 plaintiff was employed as a carpenter by Adonis Carpentry Contracting, Inc. (Adonis), a Voorhees, New Jersey company. He had worked for them for three weeks. On that day, he was framing a new house in Medford, Burlington County.
As a carpenter, plaintiff was required to use a portable circular saw. On February 14 Adonis's carpenters had two such saws available for their use at the jobsite. Both were Skilsaws. Plaintiff chose the subject Skilsaw because it had "a nice cord" and a better blade than the other. The other saw was much older than the two-year-old saw plaintiff chose.
Plaintiff identified the Skilsaw in the courtroom as the saw he had been using at the time of his injury. He agreed it was "in pretty much the same condition as it was" on February 14, 1990. Plaintiff demonstrated how the injury occurred for the jury.
Plaintiff said the Skilsaw had been sitting on the ground. Plaintiff propped the Skilsaw on his foot and, while firmly holding it, made a straight cut through a "two by four." Either as soon as the cut two by four fell to the ground or as the piece was falling to the ground, plaintiff let go of the saw's trigger and stood up. When plaintiff released the trigger, he heard the saw's motor stop. However, the blade continued to "spin pretty fast." Plaintiff made sure there was a clear spot on the deck for the saw, which he found "about eighteen inches" to his right. He did not want to put the saw down on a piece of wood lying there. When plaintiff set the saw down, it ran over his foot. About four to five seconds had elapsed between the time that plaintiff released the trigger and set the saw down. There was no debris in the area where plaintiff set down the saw. Plaintiff was wearing work boots which were almost new.
At the time of the accident, the outside walls of the house were being framed. Although there were saw horses at the job site, none was on the second floor of the house. Plaintiff gave a number of reasons why he did not take a saw horse up to the second floor. In any event, he saw no advantage to using a saw horse. Plaintiff *570 said that he had cut two by four's in the manner he did at the time of the accident "all [his] life." In fact, every carpenter he knew cut two by four's that way.
Plaintiff had used the Skilsaw for about two hours on the day of the accident. During that time, plaintiff made about twenty to thirty cuts but admitted that this was "hard to say." He cut one piece at a time and held each piece of wood very firmly over his left foot as he cut through it.
Plaintiff did not remember changing the saw's blade during that two-hour period. He did not notice any malfunction with the lower blade guard. Plaintiff had checked the lower blade guard that morning, though he could not recall when, because doing so was "a common habit" which was done to "get all the sawdust out so that you're working with a safe tool." Plaintiff demonstrated his routine for checking the blade guard and said that he removed any sawdust by banging the lower guard.
Plaintiff pointed out the saw's lower guard to the jury and showed the jury how the guard was "supposed to snap back like that." On the day of the accident, however, the guard "didn't come down. It stayed in the open position." Plaintiff knew that the guard did not close because the "saw ran over my foot, And when I pulled the saw out of my foot, I looked and the guard was stuck open." This was when plaintiff first discovered that the guard had not closed.
According to plaintiff, the saw's blade had made an eighteen-inch cut on the subfloor "from where it traveled [backwards] across the deck." The "deck" was actually the subfloor of the house. Plaintiff did not know why the saw's guard did not close.
Plaintiff said he never intentionally wedged a lower guard of a circular saw in the open position although other carpenters had done this on other occasions. He never used a saw which had the guard wedged open. To wedge the guard open, you place a wedge of wood up into the upper guard. Plaintiff had never seen this done with a nail, which he described as ridiculous. Plaintiff had seen another carpenter injured after wedging a guard open; this taught him never to make the same mistake.
Plaintiff admitted that when he made compound miter cuts, he held the guard open but he did this with his left hand, not with a wedge. Plaintiff was not making such cuts on the day of the accident. Plaintiff was steadfast in his representation that he never intentionally wedged the guard open on the saw or tried to bypass the lower blade guard, including on the day of the accident. According to plaintiff, if he had wedged the guard open, this would have slowed his productivity significantly. He would have to wait for about twenty seconds after each cut for the blade to stop spinning. Thus, wedging the guard open would have made his job more difficult and more dangerous. Plaintiff could think of no common sense reason for wedging open the guard.
After the accident, plaintiff never inspected the saw. The reattachment of his toe was more important to him at the time. Plaintiff explained that when he put the saw down, he was not able to see if the guard was in place because only the side of the saw was visible; his focus was on finding a flat, even surface to set the saw upon.
After the accident, plaintiff screamed for help. Co-worker Frank Flora, who had retrieved the missing toe, took him to the emergency room at West Jersey Hospital in Voorhees, about twenty minutes away. The doctors were able to reattach a portion of plaintiff's fourth toe with a pin; they were unable to save the fifth toe, the one that Flora found. Plaintiff was hospitalized for three days.
Approximately two weeks after the injury, plaintiff returned to the worksite to thank his co-workers for their help. At the time of his visit, plaintiff observed the saw that he had been using at the time of *571 his injury. The saw was plugged in, sitting on a deck. The Skilsaw in the courtroom had scratches on it, some of which plaintiff attributed to being stacked in the back of the truck where it was stored.
Co-worker John Scott testified on plaintiff's behalf. Scott did not know whether anyone had wedged the saw on the day of or prior to plaintiff's accident. He did know, however, that other people had wedged the Skilsaw after the accident though he did not know their names, and he never saw them do it. Scott relied on other people's statements in testifying that others had wedged the guard. Scott later said: "it's just a fact when [some people] cut rafters they wedge."
Scott had worked with plaintiff every day on the Medford jobsite for three weeks, until the accident. He saw plaintiff use the Skilsaw every day during that time. The lower guard was not intentionally wedged open during that time, including the day of the accident, and Scott had never seen plaintiff do so. On the day of the accident, Scott used the Skilsaw that injured plaintiff after plaintiff had been taken to the hospital. Scott was not asked how long he had used the saw or how many cuts he had made.
Louis E. Howarth (Howarth), a mechanical engineer, testified as an expert on behalf of plaintiff. Howarth inspected the saw three months after the accident. Howarth had no information that suggested the saw had been fixed or repaired after the accident. He did not remove the blade and look for wedge marks underneath.
According to Howarth, the American National Standards Institute (ANSI) had taken the position that Underwriters Laboratory (UL) 45 was the code which should be followed with respect to portable woodworking tools. The UL code stated that a saw should have a retractable lower guard, which shall automatically retract to the closed position when the saw is not in use. The code further stated that a guard retracting handle was acceptable on a circular saw if "to manipulate the handle the operator's finger need not be in the area of which the teeth are exposed; and also that the guard is not likely to jam in any position during intended operation." This standard existed in 1988 when the subject Skilsaw was manufactured.
Howarth conceded that in 1988, the UL-45 did not require a blade brake on a portable circular saw. However, Howarth contended that, as of 1995, it did, though he did not have the UL-45 with him. According to Howarth, every portable circular saw sold as of the time of trial should have had a blade brake. Nonetheless, Howarth acknowledged that four saws purchased by defendant's counsel the day before contained no blade brakes.
Howarth identified the basic principles of accident prevention with respect to the manufacture of power tools as (1) the hazard should be designed out of the product; (2) if the hazard could not be designed out, then it should be guarded against; (3) if the hazard could not be guarded against without impinging upon the product's function, then warnings and instructions must be provided. According to Howarth, a guard was preferable to warnings because a warning might not be followed.
The "leading hazard" of a portable circular saw is the blade. The hazard posed by the blade could not be designed out because the blade was necessary to the saw's function. However, there were two types of guards that were available. The first type was the upper blade guard, which was on this saw. The upper blade guard covered the upper part of the blade and prevented contact with the blade "at all times, where the teeth are." The second type was the retractable blade guard. The retractable blade guard "is supposed to come back every time after you finish a cut." The Skilsaw had both of these guards.
The retractable blade guard could work with two different types of springs. The first type operated like a screen door: "when you let go it pulls the door shut." The second type was the torsion spring.
*572 The spring was wound up and when released, "it shuts it and makes it close." According to Howarth, the lower blade guard protects the operator from contact with the front of the blade.
Howarth testified that sometimes the lower blade guard would not release after a cutwhen for example, it was clogged by wood chips or saw dust. When this happened, the blade would continue to rotate even though the operator believed he had turned the machine off. The principle was similar to removing the foot from a car's accelerator yet the car continued to move forward. According to Howarth, an exposed blade was a hazard because when the saw was put down, it would "run backwards on the floor on you every time." If, however, the saw had a blade brake, the blade would not have continued to spin.
The subject saw had a coil extension spring lower blade guard, which was "basically an extension spring, and that's all it does is it just pulls the lower blade guard back." Howarth estimated that the blade would continue to rotate thirteen to fourteen seconds after the trigger had been released. Howarth twice demonstrated the blade's actual stop time before the jury. After the first trigger release, the blade continued to rotate for eighteen seconds. After the second release, the blade continued rotating for nineteen seconds.
In 1988, when the Skilsaw was made, an electronic dynamic brake (also known as a blade brake) existed which would have prevented the blade from continuing to spin after the trigger had been released. The blade brake had been in existence since the 1970's. The blade brake was a safety device because in the event that the lower guard did not go into position, the blade would stop as soon as the trigger was released. In 1974, the Consumer Products Safety Commission characterized the blade brake as a safety device.
According to the Consumer Products Safety Commission "fact sheet," a portable saw blade guard could malfunction by "staying in a retracted position after completion of the cut." When this occurred, the blade would keep rotating after the power was stopped. Electronic, or dynamic, braking would cause the blade to stop rotating more quickly. This was the device that should have been on the saw that plaintiff had used. Electronic blade brakes were very reliable.
Howarth showed the jury an Ambitech electronic blade brake that had been available since 1974 and cost only $20 in 1995. According to Ambitech, the brake would stop a blade from spinning in "a fraction of a second." Howarth claimed a blade brake could have been designed into the Skilsaw used by plaintiff.
In 1988, defendant's competitors manufactured portable circular saws with blade brakes. Indeed, Sears manufactured such a saw in 1976 and 1977. Black and Decker also made a portable circular saw with a blade brake as did Makita. The manufacturers of these saws claimed that the blade would stop rotating either instantaneously or within a few seconds. Howarth, however, had never used such saws.
Although Howarth stated that cost was a factor when considering the specifications of saw designs he conceded that it was not a "major consideration." A blade brake was not a convenience feature but a "complete safety device."
Howarth concluded that defendant's saw, used by plaintiff, was defective because it was sold without a blade brake and, according to the Consumer Product Safety Commission in 1974, the lower blade guard was known to fail to retract. Howarth continued:
This is common knowledge, to give a backup safety device, as they also say it is, put an electronic brake system or a dynamic brake system on that so as whenever the trigger is release [sic], it comesthe blade comes to a stop. And one just does not rely upon the retraction of the lower blade guard.
*573 According to Howarth, the saw would have been much safer if designed with a blade brake. Howarth understood that plaintiff was injured after he had released the trigger and placed the saw on the floor with the blade still spinning, which "caused the entire saw to come around and kind of cut across his foot while the blade was still rotating."
Howarth did not know why the guard did not work on the day of plaintiff's accident. However, he testified that the blade guard failed to close "[p]robably because it jammed up with asawdust or chips wood chips of some sort, and it caused it to jam in the on position." Howarth was aware that this could happen based on his own knowledge and the writings of others. He also said that manufacturers had been told that this could happen. Consequently, this was a foreseeable hazard that wood chips could jam the guard open after a cut had been made.
Howarth did no studies in which he replicated the guard "hanging up" as a result of wood chips or sawdust. He saw no marks that suggested to him that the guard was wedged. Therefore, he assumed that the handle had not been wedged. Howarth agreed that the guard could have been wedged by sticking a nail in it, though he could not believe that a carpenter would do such a thing.
Howarth concluded that plaintiff would not have been injured if the saw had a blade brake because "the blade would have braked much too fast." Moreover, "even if the guard was not in its full protective position, when he set [the saw] down only the points would have dug into the deck wherever he sat it, but it would not have been rotating."
In reaching his conclusions, Howarth took into consideration the report and deposition testimony of defendant's expert, Peter Domeny (Domeny). Howarth disagreed with Domeny's position that the saw did not need a blade brake. According to Howarth, a blade travelling at a linear top speed of 125 to 127 miles per hour was a danger to a worker like plaintiff "[e]specially if the guard does not retract."
Howarth understood that Domeny tested saws manufactured by Sears and Black and Decker. Neither saw lasted more than 10,000 cycles before the on/off switch had failed. According to Howarth, a saw would have had to have been used for ten years to get to 10,000 cycles. Though the on/off switches had failed, Howarth believed that the electronic blade brake always worked reliably and within three seconds. The brake never failed. Indeed, even the on/off switch problems could have been averted by normal maintenance.
Howarth testified that Domeny's tests were not reliable in terms of predicting the performance of an electronic brake on plaintiff's two-year-old saw because "the cyclic grading of the test [was] far beyond what would ever be expected in the field." Based on Domeny's test of the Sears model, Howarth concluded that the electronic brake device was a "good unit" that would "outlast the product." It was the same for the Black and Decker tests. Manufacturers' manuals, including defendant's, advise consumers that the switches and brushes may need to be replaced as part of the tool's maintenance.
The benefits of a blade brake "far outweigh[ed] any risk of injury that may occur." A blade brake and a lower blade retractable guard would make a saw "[m]uch safer" because "whenever the retractable lower guard is not closed on it and you release the trigger, you're stopping that blade so fast that any motion you have you would probably prevent an injury from occurring because the blade is stopped."
Howarth also testified that as an alternative to the blade brake, the portable circular saw could have had a "flag" on it. This would have alerted the operator when the lower blade guard had not returned to its protective position. The flag would not have been an actual flag. Rather, it would be orange paint which, when *574 observed, would indicate that the guard was not in the proper position. The flag would not have impaired either the saw's or the guard's function. Howarth thought that the saw would have been safer even with just a flag. In fact, without the flag, the saw was not reasonably safe for its intended use. Such a flag would have warned plaintiff that the lower blade retractable guard was not in the closed position. With respect to the flags, Howarth conceded that other manufacturers' saws did not have orange flags. Consequently, he thought that all other manufacturers were violating the flag standard.
Ultimately, Howarth concluded that the saw had two defects: the absence of the brake and the absence of the flag. The circular saws manufactured without blade brakes by Black and Decker, Milwaukee, and Makita were defectively designed. Prior to the accident, manufacturers, including Black and Decker, manufactured saws with blade brakes and flags.
Domeny testified as an expert on behalf of defendant. At the time of trial, Domeny was employed by S.B. Power Tool Company in Chicago. S.B. was owned by Bosch GMbH in Germany. Prior to 1992, S.B. was known as the Skil Corporation. Until the Fall of 1996, S.B. was owned by Bosch and Emerson Electric Corporation.
Domeny started with defendant in 1969, one year after he immigrated to the United States from Czechoslovakia where he had received a degree in experimental physics. (Defendant shall mean Skil Corporation in its various forms from the time of Domeny's employment in 1969 up through the time of trial.) Since 1969, Domeny has worked continuously in the design and development of power tools. Domeny also has been involved in the evaluation of the safety of power tools, including the investigation of accidents and product safety development.
Domeny helped develop and design the Skilsaw that had injured plaintiff. He was the director of defendant's product safety department and, as such, was responsible for overseeing the development, design, testing and writing of manuals from a "safety point of view." During the course of his employment, Domeny worked with "a broad line of power tools from drills, grinders, circular saws."
Domeny examined the subject saw after the accident. He turned it "on" and then "off" and found that it worked fine. He took measurements and used strobe photography to "show how fast and what is the timing of the guard closure from the open to the fully closed position." Domeny checked the guard system on the saw, "and everything was working fine." When Domeny tested the speed at which the lower guard closed, it was .13 to .14 of a second, using strobe photography. The strobe photography created a permanent record of the progression of the guard from opening to closing.
According to Domeny, UL-45 governed the design of circular saws. The standard required the guard to close in .30 of a second. UL-45 was adopted by various departments of the United States Government, as well as ANSI. Although ANSI had always recognized UL-45, prior to 1984, UL-45 was incorporated by reference under ANSI standards C33.49 and 01.1. Contrary to Howarth's testimony, at the time of trial, the standard did not require an electric brake for a portable circular saw.
Upon examination of the subject saw, Domeny found "quite extensive and strong evidence" of wedging. He also found a concentration of scrape marks that were consistent with pushing an object, be it a nail or wood, between the handle and the outside surface of the upper guard. Domeny removed the saw's blade and found "the strongest evidence of the wedging." The evidence included "gouges." To confirm that the gouges were the result of wedging, Domeny removed the blade. He then explained and demonstrated how the guard could be wedged by sticking a penny nail "between the lower guard and the *575 inner surface of the upper guard." The prying of the nail caused the marks. Domeny showed the jury pictures he had taken of the inside of the saw, which he testified showed the wedge marks and gouges.
Domeny was able to tell when the wedging had been done by examining the saw. First, the aluminum underneath the marks had fresh color. Second, there was no sawdust accumulation in the gouges, which would have occurred over time. Third, no resin had accumulated over the gouges.
Domeny stated that the person identified earlier by Scott as having wedged open a saw before plaintiff's use could not have been the person who made the marks he observed because plaintiff testified that he had made thirty to fifty cuts on the day of the accident. (Actually, Scott never said that anyone had wedged the Skilsaw prior to the accident.) That number of cuts would have caused the gouges to fill with sawdust. Finally, the blade itself indicated wedging because dust appeared on it from a leather boot and blood. If the Skilsaw had been used extensively after the accident, the blood would have smeared away.
According to Domeny, defendant could have incorporated a blade brake into its saws, as the principle had been known since the 1960's. In fact, Black & Decker, Makita and Ryobi were using the technology in "1986, `88." However, defendant made a conscious decision not to use the technology "because of the benefits and detriments of the feature."
According to Domeny, "the benefit of the design has to outweigh the negatives of the design." The one safety benefit is that certain types of accidents could be eliminated by a brake. Domeny stated, however, that there were safety detriments to the incorporation of an electric brake into the portable circular saw. First, about fifty-five percent of all accidents occurred while the trigger was engaged and the operator was in the process of cutting. Second, about thirty-three percent of accidents occurred during a kickback, which also happened when the operator was in the process of cutting. Third, another ten percent of the accidents occurred as the result of someone having grabbed the blade itself accidently while reaching for some other object. Thus, a blade brake would not have prevented ninety-eight percent of saw accidents. Or, as a corollary, a blade brake would have prevented only two percent of saw accidents. Domeny emphasized that the two percent did not mean two percent of all users, but rather two percent of all accidents.
Domeny agreed that it would be a good thing to help prevent even two percent of all accidents but only "if the detriment of this device would not cause even more accidents than the two percent benefit that you gain out of it." There were three different categories of detriment posed by the brake. There was an increased risk of (1) electrocution, (2) switch failure, which would prevent the saw from stopping after the trigger was released and cause a kickback, and (3) unsafe behavior by operators who might view the brake as a back-up system when, in fact, the brake "will not work every time." In addition, there were carpenters who still would have wedged the guard open in the belief that the brake would protect them. Thus, in 1988, defendant made the decision that despite the technology and feasibility of the brake:
The negative aspects: the electrocution, shock hazard, the unsafe motor component failures, and the reliability factor, all those combined negative aspects outweigh the potential benefit of saving two percent of theall the accidents. There would be accidents of different nature happening if you incorporate the brake.
Defendant had used a "flag" at one point but discontinued its use because it caused the lower guard to hang up. Moreover, for a majority of users, after a while the color of the flag would become just another color like the color of the tool itself. No *576 industry standard required a safety flag on the lower guard.
Domeny testified that plaintiff's use of his foot to stabilize the wood he was cutting was not recommended and defendant's manual advised against it. According to Domeny, the instability of positioning a piece of wood over one's foot could cause the saw to kick back. Nonetheless, Domeny did not believe that plaintiff's accident was caused by a kickback. Domeny concluded that the Skilsaw was not defectively designed and that "[t]he manner in which it was used or misused contributed or caused the accident."
The jury voted five to one that the Skilsaw was defectively designed and, by the same count, that the defective design was the proximate cause of plaintiff's injuries. As we can see, the case was squarely contested on the issue of defective design, not on the issue of "state-of-the-art."

IV
Defendant raises these six issues which we will consider in serial fashion:
1. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE CHARGED THE JURY ON THE STATE-OF-THE-ART DEFENSE OVER DEFENDANT'S OBJECTION AND, IF NOT, WHETHER THE CHARGE MISLEAD OR CONFUSED THE JURY AND PREJUDICED A SUBSTANTIAL RIGHT OF DEFENDANT'S (defendant's points I and II).
2. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE PERMITTED PLAINTIFF TO OFFER EVIDENCE OF POST-ACCIDENT USE OF THE PRODUCT BECAUSE PLAINTIFF HAD FAILED TO DISCLOSE SUCH EVIDENCE DURING DISCOVERY (defendant's point III).
3. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE PERMITTED CERTAIN QUESTIONS TO BE ASKED OF DEFENDANT'S EXPERT, WHO WAS ALSO ITS EMPLOYEE, ON CROSS-EXAMINATION (defendant's point IV).
4. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE DENIED DEFENDANT'S MOTION FOR JUDGMENT AT THE CLOSE OF ALL THE EVIDENCE BECAUSE REASONABLE MINDS COULD NOT CONCLUDE THAT DEFENDANT'S PRODUCT WAS DEFECTIVE (defendant's point VI).
5. WHETHER THE APPELLATE DIVISION SHOULD DECLINE TO FOLLOW TIRRELL V. NAVISTAR INTERNATIONAL, INC., 248 N.J.Super. 390, 591 A.2d 643 (App.Div.), CERTIF. DENIED, 126 N.J. 390, 599 A.2d 166 (1991), ORDER A NEW TRIAL, AND PERMIT DEFENDANT TO ASSERT THE COMPARATIVE NEGLIGENCE DEFENSE IN THIS PRODUCT LIABILITY CASE WHERE PLAINTIFF WAS INJURED BY DEFENDANT'S PRODUCT WHILE USING IT IN THE WORKPLACE (defendant's points V, VII, VIII).
6. WHETHER THE TIRRELL DECISION VIOLATES THE SEPARATION OF POWERS CLAUSE OF THE NEW JERSEY CONSTITUTION, AS WELL AS THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE NEW JERSEY AND UNITED STATES CONSTITUTIONS (defendant's points VII and VIII).

1.
Defendant contends that the judge committed reversible error when, at plaintiff's request and over defendant's objection, he *577 charged the jury on the state-of-the-art defensea defense that defendant did not wish to assert. According to defendant, the charge imposed a burden upon it that it neither assumed nor the law permitted. Defendant maintains it was prejudiced by the charge because plaintiff had argued defendant did not meet its burden of proof on the state-of-the-art defense after defendant had rested without offering proofs on the defense. Finally, according to defendant, the instruction confused the jury on the issue of which party bore the ultimate burden of proof and denied defendant a fair trial. According to defendant, "state-of-the-art was not an issue" in this case.
There was considerable discussion at the charge conference about whether the state-of-the-art defense should be charged and, if so, whether it should be in the form of 5.34(c) or 5.34(d) of the Model Jury Charges, Civil. According to defense counsel, defendant conceded that it could have placed a blade brake on the saw in 1988. However, defendant chose to forego the brake due to the "countervailing safety problems" it created. This is consistent with Domeny's testimony. After some discussion, defense counsel appeared agreeable to the charge in 5.34(c), though he disagreed with the charge in 5.34(d), which represented the statutory state-of-the-art defense, N.J.S.A. 2A:58C-3(a)(1). Ultimately, defense counsel told the judge:
Well, Judge, I'll make itI'll make it easy, all right? If wewe're not invoking thewhich is an affirmative offense [sic], I'm not invoking the statutory provisions of the new Products Liability Act, okay? You can leave C in its entirety and I'll just deal with it.
Later, when the discussion returned to the state-of-the-art charge and defendant's burden of proof, defense counsel interrupted the exchange between the judge and plaintiff's counsel by declaring: "Judge, leave it in. Leave it in, forget it, I'll deal with it."
Plaintiff argues that these words amounted to a withdrawal of any objection that defendant had to the state-of-the-art charge and defendant waived its right to appeal the jury instruction. Moreover, plaintiff points out that defense counsel failed to object at subsequent opportune moments.
Despite defense counsel's statements to "leave it in, forget it" and "I'll deal with it," we conclude, given the extensive discussion about the charge and the obvious need to move the proceeding along, the objection to the charge was preserved, albeit in a general form. R. 1:7-2. Moreover, during a sidebar discussion in the midst of plaintiff's counsel's summation, defense counsel reiterated the fact that he had agreed to a state-of-the-art charge only to move the case along. Thus, we do not think that defense counsel's failure to object to the state-of-the-art charge at each and every opportunity was a waiver of the objection, and we consider the issue on the merits.
Judge Bookbinder outlined the parties' burdens generally as follows:
Now, the plaintiff says that the saw was defective because it did not incorporate a safety flag and/or a blade brake. The defendant, on the contrary, says that the product was not defective and that it was reasonably safe for its intended and reasonably foreseeable purposes.
Now, burden of proof is on each person, each party, to establish their claim by a preponderance of the evidence. In other words, if a person makes an allegation then that person must prove the allegation. In this action Mr. Cavanaugh has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues; one, that there is a defect, two, that the defect was a proximate cause of the injury, and, three, damages.
Now, I'm going to get into this a lot more in depth but this is just a little idea. Now, the defendant took on themselves *578 a burden here because they are indicating that theirthey complied with the state of the art and because of that they have a burden for that. And even if they don't prove that, that doesn't mean that they automatically lose the case, just if they do prove that they automatically win the case. You'll hear a lot about that morea lot later.
Later, in charging the jury on the risk-utility analysis, Judge Bookbinder instructed:
Now, in proving a defect in the design of the product the plaintiff need not prove that the manufacturer knew that the product was dangerous. We legally assume that the manufacturer is aware of any danger which you decide the product had and whether the defendant actually knew of the existence of the danger is meaningless. The question for you to decide is whether assuming the defendant knew of the danger in the product they nevertheless acted in a reasonably careful manner in marketing, selling or distributing the product.
If the danger of the design was not known at the time of the manufacture, the defendant cannot be found to be at fault. But the burden on this point falls on the defendant. [If t]he defendant contends that the danger was unknowable it must prove that contention.
....
Okay. Now, in this case the defendant is not saying that the danger was unknowable so you don't have to worry about them assuming that burden. Now, let's talk about state of the art. I mentioned this a little bit before, I want to mention it again. The plaintiff has to prove the elements of the case. State of the art is something that if the defendant proved the elements they automatically win, and you'll hear that again. A couple of times you'll hear that again.
If they don't prove it they don't automatically lose, they can still win without proving each one of these elements. Even if they prove some of the elements they can still win, because, remember, the plaintiff has the burden of proving their elements. So, if the plaintiff fails to prove their elements the defense can still win even if they don't prove every one of these things. Okay.
So, there's been evidence of common practice and standards of evidence. The evidence bears upon the risk-utility analysis that you're being asked to make here or to measure the reasonableness of the conduct assuming knowledge of the harm the products can cause. Compliance of [sic] common practice or industry standards does not mean the product is safe, it may still be found to be defective in design, however, that compliance, along with all of the other evidence in this case, may satisfy you that the product is properly made.
Now, they're saying that when the product left the defendant's control there was no practical and technically feasible alternative design for the product, the kind of design that would have prevented the harm while at the same time the kind of design that would not have substantially impaired intended or reasonable function of the product.
If there was no better design available when the product left the control of the defendant, that defendant cannot be held liable for a design defect. However, the defendant has the burden of proof on the issue.
So, based on your review of the evidence ask yourselves, has the defendant proven that there's no other practical or workable design that would have prevented the harm that is claimed to have taken place in this case without substantially impairing or reducing the intended or reasonably anticipated function?
If the defendant has met its burden of proof by the greater weight of the credible evidence on this issue, it must win on whether it defectively designed the product. Even if the defendant has *579 not met its burden of proof, plaintiff may win only if they prove the design defect.
Okay, so, if they prove this, if the defendant proves it they must win. If they don't prove it then you have to look and see what the plaintiff proved and if plaintiff proved its case the defendant hasn't again prevented them from proving his case, if that's a possibility, then the plaintiff wins. But if plaintiff hasn't proven his case it was no win for the plaintiff.
Later, when the judge summarized the elements of plaintiff's proofs, he instructed: "If the defendant has provedfirst of all, if the plaintiff has failed to establish any one of those then it goes to the defendant. In addition, if the defendant proved compliance with state of the art, then the defendant must win. Okay."
"Jury instructions must correctly state the applicable law in understandable language and plainly spell out how the jury should apply the facts as it may find them." McDonough v. Jorda, 214 N.J.Super. 338, 346, 519 A.2d 874 (App.Div.1986), certif. denied, 110 N.J. 302, 540 A.2d 1282 (1988), cert. denied sub. nom., Jorda v. City of New Brunswick, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). "[T]he trial judge must prepare a full, complete charge on all facets of the applicable law." Ibid. "The precise language of every jury instruction must be tailored by the trial judge to fit the particular fact situation and the applicable statutory or decisional law." Dimogerondakis v. Dimogerondakis, 197 N.J.Super. 518, 520 n. 1, 485 A.2d 338 (Law Div.1984). This is especially so in a product liability case. Fabian v. Minster Mach. Co., Inc., 258 N.J.Super. 261, 271, 609 A.2d 487 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992).
"Correct jury charges are essential to a fair trial." Ibid. Jury instructions must be "clear and correct" because they "serve as `a road map to guide the jury.'" State v. Cooper, 151 N.J. 326, 363, 700 A.2d 306 (1997) (quoting State v. Martin, 119 N.J. 2, 15, 573 A.2d 1359 (1990)). Yet, an allegedly erroneous jury charge "`cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.'" State v. Delibero, 149 N.J. 90, 106-07, 692 A.2d 981 (1997) (quoting State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973)). Nonetheless, even an erroneous instruction may be upheld if it was not capable of "prejudicing the substantial right of a party." Morlino v. Med. Ctr. of Ocean Co., 295 N.J.Super. 113, 125, 684 A.2d 944 (App.Div.1996), aff'd, 152 N.J. 563, 706 A.2d 721 (1998).
"The standard for assessing `the soundness of instructions is, not what the ingenuity of counsel can, at leisure, work out the instructions to mean, but how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary men and jurors understand the instructions as a whole.'" Crego v. Carp, 295 N.J.Super. 565, 573, 685 A.2d 950 (App.Div.1996), certif. denied, 149 N.J. 34, 692 A.2d 48 (1997) (quoting Davidson v. Fornicola, 38 N.J.Super. 365, 371, 118 A.2d 838 (App. Div.1955), certif. denied, 20 N.J. 467, 120 A.2d 275 (1956)). "As stated by the New Jersey Supreme Court, `[s]ufficiency of a charge ... should be measured by determining whether or not jurors, in light of all the facts, would misunderstand or be confused.'" Ibid. (quoting Board of Educ. of Asbury Park v. Hoek, 38 N.J. 213, 228, 183 A.2d 633 (1962)). In other words, the court "consider[s] the overall effect of the charge and look[s] at the language in context to see whether the jury was misled, confused or inadequately informed." Jefferson v. Freeman, 296 N.J.Super. 54, 65, 685 A.2d 1357 (App.Div.1996). Indeed, "[t]he ultimate issue is whether the jury was misled or confused." Ruiz v. Toys "R" Us, Inc., 269 N.J.Super. 607, 613, 636 A.2d 117 (App.Div.1994); Warrington v. Bird, 204 N.J.Super. 611, 615, 499 A.2d 1026 (App.Div.1985), certif. denied, 103 N.J. 473, 511 A.2d 653 (1986).
*580 "A design defect does not come into being at the time of an accident." Green v. General Motors Corp., 310 N.J.Super. 507, 516, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998). "Rather, it occurs when a defective product is placed into the stream of commerce." Ibid. In a design defect product liability case, "the plaintiff bears the burden of proof." Lewis v. American Cyanamid Co., 155 N.J. 544, 570, 715 A.2d 967 (1998).
"An inference of defectiveness may not be drawn from the mere fact that someone was injured." Zaza v. Marquess and Nell, Inc., 144 N.J. 34, 49, 675 A.2d 620 (1996). To succeed on a claim that a product was defectively designed, "[a] plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Lewis v. American Cyanamid Co., 155 at 570, 715 A.2d 967. Here, the crux of plaintiff's case really was not that "the product's risks outweighed its utility." Ibid. Rather, the plaintiff's theory was simple: that the Skilsaw "could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Ibid. This theory is recognized in the Restatement (Third) of Torts: Products Liability § 2(b) (1998). We, in turn, recognize this Restatement design defect theory. Green v. General Motors Corp., 310 N.J.Super. at 518, 709 A.2d 205; Fiorino v. Sears Roebuck and Co., Inc., 309 N.J.Super. 556, 563, 707 A.2d 1053 (App.Div.1998); Congiusti v. Ingersoll-Rand Co., Inc., 306 N.J.Super. 126, 138-39, 703 A.2d 340 (App.Div.1997) (citing the 1997 Proposed Final Draft Restatement (Third) of Torts: Products Liability of § 2(b)); Smith v. Keller Ladder Co., 275 N.J.Super. 280, 284, 645 A.2d 1269 (App. Div.1994) (citing the Restatement (Third) of Torts § 2(b) (Tent. Draft No. 1 1994)). As stated previously, the Supreme Court of New Jersey recently signalled that it also recognizes this design defect theory. Lewis v. American Cyanamid Co., 155 N.J. at 570, 715 A.2d 967. The Supreme Court appears to have recognized the theory as far back as 1982, albeit in the context of a failure-to-warn case. Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 201 and n. 5, 447 A.2d 539 (1982) (citing Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 238-39 n. 1, 432 A.2d 925 (1981)).
Unfortunately, the new Restatement (Third) design defect theory was not reduced to a model jury charge at the time of trial. While the absence of such a model jury charge certainly does not preclude a trial judge from instructing the jury that a plaintiff must prove that there was a reasonable alternative design and that the omission of that alternative design rendered the product not reasonably safe, Congiusti v. Ingersoll-Rand Co., 306 N.J.Super. at 139, 703 A.2d 340, the fact remains that the risk-utility analysis is still used when a plaintiff posits this theory. Lewis v. American Cyanamid Co., 155 N.J. at 571, 715 A.2d 967. According to the Lewis Court, a plaintiff who, like plaintiff here, asserts "that the product could have been designed more safely must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible." Ibid. The question remains, however, whether the state-of-the-art defense should be charged in such a case.
In Fabian v. Minster Mach. Co., Inc., 258 N.J.Super. at 275, 609 A.2d 487, we ruled that in situations where "no one contested the fact that all of the suggested safety devices were technologically feasible and well-known when the machine was manufactured," state-of-the-art is not an issue. That state-of-the-art should not be charged when the parties agree, as in this case before us, that the suggested safety devices were "technologically feasible and well-known" when the product was manufactured, makes complete sense. Defendant's defense did not rest upon an argument that the blade brake was not *581 technologically feasible or well-known. Indeed, Domeny expressly testified that the blade brake was available and he acknowledged that it had been used by other manufacturers. According to Domeny, defendant had considered, and rejected, the use of a brake because the additional hazards created by the brake outweighed the risk that a user would be injured in the manner that plaintiff claimed he had been injured. Thus, defendant's decision was not dictated by what it believed to be the state-of-the-art; the decision was a design judgment call.
Despite Fabian `s sensible elimination of the state-of-the-art defense in cases where the parties agree that the alternative was known and technologically feasible, the Lewis Court has clearly stated that in cases where the plaintiff seeks to prove the existence of a "safer, practical and feasible alternative design, defendant may assert the `state-of-the-art' affirmative defense." Lewis v. American Cyanamid Co., 155 N.J. at 571, 715 A.2d 967. Although the propriety of the state-of-the-art defense was not at issue in Lewis, 155 N.J. at 544, 715 A.2d 967, we conclude that the decision is controlling here because (1) the Court clearly stated that a defendant may assert the defense where a plaintiff seeks to prove a "safer, practical and feasible alternative design" and (2) the controlling principles in Lewis, 155 N.J. at 544, 715 A.2d 967, are the same as in the case before usthe only real difference is the kind of product claimed to be defectively designed.
The state-of-the-art defense has been codified at N.J.S.A. 2A:58C-3(a)(1), which states:
a. In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:
(1) At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product....
The statutory state-of-the-art defense is available to all defendants in cases filed after July 22, 1987. Model Jury Charges, Civil § 5.34(2)(c) n. 4 and (d) n. 2. State-of-the-art "refers to the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed." O'Brien v. Muskin Corp., 94 N.J. 169, 182, 463 A.2d 298 (1983). State-of-the-art or "the very safest product of that type which [an] industry could design at the time of manufacture" "is defined as a product for which there was no reasonable alternative design." Dreier, Goldman & Katz, New Jersey Products Liability & Toxic Torts Law § 14:2 at 330 (Gann 1999).
Of course, "`[w]hen an affirmative defense is raised [in a civil case], the defendant normally has the burden of proving it.'" Roberts v. Rich Foods, Inc., 139 N.J. 365, 378, 654 A.2d 1365 (1995) (quoting Biunno, Current N.J. Rules of Evidence, comment 2 on Evid.R. 101(b)(1) (1994-95)). However, "[t]he burden on a defendant who claims a state-of-the-art defense is to prove only the technological state-of-the-art when the product was manufactured." Fabian v. Minster Mach. Co., 258 N.J.Super. at 274, 609 A.2d 487. "The defendant ha[s] no burden to prove its conformity with the state-of-the-art." Ibid. "It remains plaintiff's burden, unaffected by the Product Liability Act, to prove non-conformity." Ibid.
Sometimes the parties' experts agree that an alternative design existed but disagree on whether the alternative should have been incorporated into the design of the product in issue. Consider Lewis v. American Cyanamid Co., 155 N.J. at 544, 715 A.2d 967, for example. There, the plaintiff was burned over twenty-five percent of his body when he re-entered a *582 room shortly after activating two foggers manufactured by the defendant, United Industries Corp. (United), one of which exploded. Id. at 551-52, 715 A.2d 967. The foggers, which were manufactured in either 1988 or 1989, used a hydrocarbon propellant. Id. at 552, 565, 715 A.2d 967.
At trial, the plaintiff asserted that the foggers were defectively designed in that they should have used a compound known as P-22 rather than a hydrocarbon propellant. Id. at 552, 715 A.2d 967. United contended "that the use of P-22 would have posed risks equal to or greater than the risk of flammability to which plaintiff was exposed" vis-a-vis the hydrocarbon propellant. Id. at 565, 715 A.2d 967.
"Both plaintiff and defendants offered expert testimony regarding the practicality and feasibility of P-22 as an alternative design." Id. at 552, 715 A.2d 967. The plaintiff's expert testified that P-22 was safe and three times less flammable than the hydrocarbon propellant. Ibid. He also testified that P-22 was used by other manufacturers of foggers. Ibid.
The defendant did not challenge the fact that P-22 would be less flammable. Id. at 565, 715 A.2d 967. Instead, counsel for United cross-examined the plaintiff's expert on his calculations with respect to the concentration of propellant in the air at the time of the plaintiff's accident and then suggested that the concentration of propellant was so high that even a P-22 propellant would have exploded. Ibid.
The defendant's expert testified that P-22 was, among other things, "too highly pressurized for safe use in the foggers." Id. at 552, 715 A.2d 967. He contended that P-22 "would have created an increased danger of explosion." Id. at 566, 715 A.2d 967. Nonetheless, the defendants' expert acknowledged that other fogger manufacturers had used P-22 as a propellant in 1988 and 1989. Ibid.
After a jury verdict in the plaintiff's favor, the trial court entered a judgment notwithstanding the verdict, holding that the plaintiff had not met his burden of proving that P-22 was a feasible and practical design alternative because the defendants "had adduced sufficient proof that P-22 was dangerous." Id. at 553, 715 A.2d 967. We reversed the judgment notwithstanding the verdict. Ibid. The Supreme Court affirmed our decision. Id. at 577, 715 A.2d 967.
The Supreme Court held that the "contested issue of fact regarding the practicality and feasibility of a proposed alternative design" required the matter to go to the jury. Id. at 568, 715 A.2d 967. On the state-of-the-art defense, the Court explained that "[e]ven if plaintiff can prove that P-22 was a safer, practical and feasible alternative design, defendant may assert the `state-of-the-art' affirmative defense." Id. at 571, 715 A.2d 967. The Court continued:
United bears the burden of proving that its design of the foggers represented the state of the art. Thus, if United can prove that P-22 was not a practical and feasible alternative at the time the foggers left its control, it would not be liable for the alleged design defect.
[Ibid. (citations omitted).]
The Court concluded:
Whether United has proven the state-of-the-art defense is therefore a factual issue best left to the jury. It is for the jury to decide whether United has proven that P-22 was not a practical and feasible alternative at the time the foggers left defendant's control. On retrial, if the jury finds that United has proven the state-of-the-art defense, defendant would not be liable for the alleged design defect.
[Id. at 572, 715 A.2d 967.]
The Supreme Court then reviewed what typically occurs in cases where plaintiffs claim that a product was defective because an allegedly safer design was not used:
Plaintiffs in products liability actions often try to prove that a product was defective because a safer alternative design *583 existed when the product left the defendant's control. Defendants have an absolute defense if they can prove that at that time, a safer alternative was neither practical nor feasible.
[Id. at 574, 715 A.2d 967 (citing N.J.S.A. 2A:58.1-3a(1)).]
Lewis v. American Cyanamid Co., 155 N.J. at 544, 715 A.2d 967, is strikingly similar in principle to this case before us except the issue of whether a state-of-the-art defense charge should have been given to the jury was not present in Lewis. However, the Supreme Court's opinion is clear that when proofs similar to those presented in this case before us are proffered, the state-of-the-art defense is appropriate.
Here, plaintiff tried to prove the Skilsaw was defectively designed because a safer alternative existed, to wit: a portable circular saw with a blade brake. Defendant, through Domeny's testimony, tried to prove plaintiff's proposed safer alternative was neither practical nor feasible because a portable circular saw with a blade brake would be more dangerous than a portable circular saw without a blade brake. Defendant also took issue with the practicality of the "flag," but defendant's brief focuses on the brake. Except for the type of product, this is exactly what happened in Lewis, 155 N.J. at 544, 715 A.2d 967. Under Lewis, 155 N.J. at 544, 715 A.2d 967, defendant here, in principle, had asserted the state-of-the-art defense. Indeed, even though defendant did not challenge the technological availability of a blade brake in 1988, it most certainly challenged its practicality. N.J.S.A. 2A:58C-3(a)(1). The judge's decision to charge the jury on the state-of-the-art defense was not erroneous under Lewis.
Despite the propriety of the judge's decision to give the state-of-the-art-defense charge in this case, the charge itself was somewhat problematic, if only technically. In his favor, the judge clearly and repeatedly told the jury that plaintiff bore the burden of proving that the saw was defectively designed. The judge also read 5.34(c) and 5.34(d) of the Model Jury Charges, Civil almost verbatim. However, before and after the judge read the model charges, he told the jury that defendant had the burden of proving that the Skilsaw complied with the state-of-the-art. This instruction may have technically violated Fabian v. Minster Mach. Co., Inc., 258 N.J.Super. at 261, 609 A.2d 487, and perhaps Lewis, 155 N.J. at 544, 715 A.2d 967. The judge should have instructed the jury that the defendant had the burden of proving the state-of-the-art defense and the plaintiff had the burden of proving noncompliance with the state-of-the-art.
Although the Lewis Court's initial declaration that the defendant had the burden of proving that "its design of the foggers represented the state of the art," Lewis v. American Cyanamid Co., 155 N.J. at 571, 715 A.2d 967, may be contrary to Fabian, the Court's subsequent statements about the defendant's burden were consistent with Fabian, 258 N.J.Super. at 261, 609 A.2d 487. For example, after stating that the defendant was required to prove that its product "represented the state of the art," the Lewis Court, in the next sentence, stated that the defendant would prevail if it could prove that P-22, the plaintiff's alternative design, "was not a practical and feasible alternative at the time the foggers left its control." Lewis, 155 N.J. at 572, 715 A.2d 967 (citing Fabian, 258 N.J.Super. at 274, 609 A.2d 487). Later, the Court stated it was for the jury to decide whether the defendant had "proven that P-22 was not a practical and feasible alternative at the time the foggers left its control." Ibid. Later still, the Court pronounced that the defendant had "an absolute defense if [it could] prove that ... a safer alternative was neither practical nor feasible." Id. at 574, 715 A.2d 967. Thus, despite that first sentence that seemingly contradicts Fabian, 258 N.J.Super. 261, 609 A.2d 487, the Lewis, 155 N.J. at 544, 715 A.2d 967, decision maintains Fabian`s pronouncement that *584 the focus of a defendant's burden with respect to the state-of-the-art defense is the practicality and feasibility of the plaintiff's suggested alternative. The judge's instructions here to the effect that defendant was required to prove it complied with the state-of-the-art were perhaps erroneous. Yet, the inquiry does not end here for we must decide whether these unobjected-to instructions, R. 1:7-2, had the capacity to confuse or mislead the jury and, as a result, were capable of "prejudicing the substantial right of [defendant]." Morlino v. Medical Ctr. of Ocean County, 295 N.J.Super. at 125, 684 A.2d 944.
We do not think this error had a capacity to confuse or mislead the jury. The alleged defects in the Skilsaw's design were the absence of a blade brake or flag. If the jury agreed that a blade brake or flag were the state-of-the-art, then the error made no difference because defendant clearly did not comply, and could not have complied, with either. In fact, defendant admitted as much, and it was obvious that the Skilsaw did not comply with the plaintiff's version of the state-of-the-art. The jury would have had to conclude that the brake or flag represented the state-of-the-art because if the jury did not, it would have been compelled to render a defense verdict. Moreover, the Skilsaw at issue complied in every respect with what defendant claimed its version of the state-of-the-art required. For these reasons, we do not think that the charge was capable of any prejudice to defendant. Despite the judge's possible violation of Fabian v. Minster Mach. Co., 258 N.J.Super. at 261, 609 A.2d 487, and Lewis v. American Cyanamid Co., 155 N.J. at 544, 715 A.2d 967, in charging the jury that defendant was required to prove that the Skilsaw complied with the state-of-the-art, the charge was not capable of misleading or confusing the jury to defendant's detriment. We reject defendant's appellate challenge to the charge because it could not have prejudiced a substantial right of defendant.
This case was presented to the jury as a defective design case. The competing experts, as our review of the evidence clearly reveals, clashed directly in this design confrontation. Counsel argued the case to the jury on the competing design theories. The judge clearly charged the jury that plaintiff had the burden of proving a design defect. The jury found that the circular saw was "defectively designed" in answer to special interrogatories. The jury found the defective design was "a proximate cause of the accident." None of the verdict form special interrogatories dealt with the "state-of-the-art" issue. In this case "state-of-the-art" was clearly a subtext of defective designa mantra of distraction but not of substance. We are satisfied that the issue of defective design was fairly fought out and clearly resolved by the jury.

2.
Defendant contends that the judge committed reversible error when he permitted plaintiff to offer evidence of the saw's post-accident use despite the fact plaintiff had withheld this information from defendant in discovery. According to defendant, plaintiff expressly denied during discovery having had any information about post-accident use. Plaintiff's attorney had stated on the record at a deposition that he had no such information. Defendant argues that when, at trial, Scott, who testified on plaintiff's behalf, stated he had used the Skilsaw after plaintiff's accident, defendant was "sabotaged in a manner that destroyed its credibility in front of the jury." This is because the testimony came after defendant's counsel had made his opening statement and cross-examined Howarth. We conclude defendant's argument is without merit. Defendant never asked plaintiff during the course of discovery if he knew whether anyone had used the Skilsaw after he had been injured.
At plaintiff's deposition in April 1993 defense counsel asked him whether the saw was used after the date of his accident. *585 Plaintiff replied: "I couldn't tell you. I was in the hospital." Later at the deposition, defense counsel informed plaintiff's counsel that he was "interested in knowing if the saw had been used after the day of the accident." Plaintiff's counsel replied: "We wouldn't know that information, anyway. Only Adonis Construction [plaintiff's employer] would know that." Plaintiff's counsel further stated: "You can take the deposition of Adonis." Defense counsel never deposed anyone from Adonis.
Defense counsel did propound interrogatories upon plaintiff's counsel. Defendant states that Interrogatory Nos. 8 and 9 asked for the contents of oral and written statements obtained by plaintiff or anyone acting on his behalf; plaintiff produced none. Defendant also points to Interrogatory Nos. 27 and 28, which sought information about whether the saw had been altered, modified, added to, removed or replaced, and complains that plaintiff "supplied no information about post-accident use of or modification to the saw" in response.
At trial in December 1996, plaintiff's counsel confirmed that he had spoken to Scott, who informed him that he (Scott) had used the saw subsequent to plaintiff's accident. However, plaintiff's counsel also confirmed that he had not taken any written or recorded statement from Scott.
The information pertaining to post-accident use was never precisely sought through interrogatories. Although Interrogatory Nos. 8 and 9 sought the contents of statements, plaintiff's counsel represented that while he talked to Scott, he did not take any memorialized statement from him. Although Interrogatory Nos. 27 and 28 sought information about whether the saw had been altered, modified, added to, removed or replaced, the questions did not seek information about whether the saw had been used. The interrogatories referenced by defendant do not support its argument that plaintiff failed to disclose that Scott had used the saw after plaintiff's accident.
As for plaintiff's counsel's representation made at his client's deposition in April 1993 that he did not know whether the saw had been used after plaintiff's accident, there is nothing in this record to contradict the veracity of that statement at the time it was made. Moreover, during the next month, plaintiff's counsel subpoenaed the names of plaintiff's co-workers at Adonis. After plaintiff's counsel had received Adonis's response to the subpoena, a copy of the response, which identified the co-workers, including Scott, was sent to defendant's counsel with a letter in which plaintiff's counsel stated he was amending plaintiff's interrogatory answers to include the co-workers who were identified as "persons with potential knowledge of the incident inasmuch as those persons were working with plaintiff on the day of the accident."
Finally, though defendant claims that plaintiff testified at trial that he knew that Scott had used the Skilsaw after the accident, the citations to the record actually do not support this contention. In fact, plaintiff merely testified that when he returned to the worksite after the accident to thank his co-workers for assisting him, he observed that the Skilsaw he had been using at the time of his accident was plugged in. Plaintiff did not say that he saw Scott, or anyone else, using the saw.
Regardless of whether defendant had been misled or not, the judge gave an instruction to the jury to disregard the testimony that the saw was plugged in or that plaintiff even observed the saw when he went to the worksite. Plaintiff complains that despite the instruction, the judge later permitted Scott to testify about his own use of the saw after the accident. Scott's testimony was direct evidence of post-accident use. Plaintiff's testimony clearly was not, which is why the judge instructed the jury to disregard it.
Defendant was aware of Scott's identity more than three years before trial. Had *586 defendant's investigator interviewed Scott during that three-year-period, there would have been no surprise at trial. In addition, the fact remains that defendant never asked plaintiff about post-accident use of the Skilsaw during discovery, and no evidence counters plaintiff's counsel's statement at the time of the deposition in April 1993 that he did not know whether the saw had been used after the accident. We reject defendant's contention that the judge committed reversible error when he permitted Scott to testify about his postaccident use of the Skilsaw. The defense could have interviewed Scott before trial and learned this information.

3.
Defendant contends that the judge committed reversible error by permitting plaintiff's counsel to offer evidence on irrelevant issues and cross-examine Domeny, defendant's expert, with bad faith questions. According to defendant, the judge permitted plaintiff's counsel to introduce evidence with respect to and make argument about defendant's conduct which, defendant claims, is irrelevant in a product liability case. Also, according to defendant, the judge permitted plaintiff's counsel to cross-examine Domeny based upon questions that had no good faith basis. Due to the large number of allegedly objectionable questions (we counted 22), we address them in categories.
Defendant maintains that it was improper for plaintiff's counsel to question Domeny about whether defendant chose to (1) compete in the "cheaper saw market"; (2) take a "calculated risk" that it would spend more money paying claims for injuries sustained in a manner similar to that claimed by plaintiff than it would in putting blade brakes on the Skilsaw; (3) how many serious injuries and deaths would have to occur before defendant would change the Skilsaw's design; (4) whether there would have been no lawsuit if Domeny were a better product safety director; and (5) whether the Skilsaw's warnings were adequate. Defendant argues that these questions focused on defendant's conduct, which was not an issue in this product liability case.
Defendant also maintains that plaintiff's counsel "exploited" the answers to these improper questions during his closing argument by arguing that (1) defendant ignored a consumer safety report by designing its saw without a blade brake; (2) defendant was motivated by profit in designing the saw "to the minimum acceptable standard"; (3) defendant decided not to use a blade brake because it would make more money in the "cheaper" saw market than it would paying claims; and (4) that there were insufficient warnings on the saw.
Defendant's expert, Domeny, was also its employee. A defendant's employee, if qualified, may serve as its expert. Cf., Corcoran v. Sears Roebuck and Co., 312 N.J.Super. 117, 134, 711 A.2d 371 (App.Div.1998) (where employee of product manufacturer testified as expert witness). As with any other witness, an expert is subject to cross-examination. The court has "broad discretion in determining the scope of cross-examination." State v. Silva, 131 N.J. 438, 444, 621 A.2d 17 (1993).
Though plaintiff's counsel was very hard on Domeny, we do not conclude that his cross-examination of the witness went beyond the bounds of proper cross-examination, except for the "warnings" questions. Most of plaintiff's counsel's questions were simply his "spin" or argumentation on answers previously given by Domeny. On direct, Domeny testified that defendant could have made more money selling saws with blade brakesthus, plaintiff's counsel's suggestion on cross-examination that defendant made the decision to participate in the "cheaper" saw market. Domeny also testified that under a risk-utility analysis, there would be more injuries from saws with blade brakes than there would be with saws without blade brakesthus, plaintiff's counsel's inquiry as to the number of injuries that would *587 have to occur for that analysis to change. This no doubt prompted counsel's argumentative suggestion during closing that defendant was motivated by profit in designing the saw "to the minimum acceptable standard" and decided not to use a blade brake because it would make more money in the "cheaper" saw market than it would paying claims.
The questions about whether the product would have been safer if Domeny were a better product safety director went to the issue of whether Domeny was biased. "A paramount purpose of cross-examination is the impeachment of the credibility of the witness." Perna v. Pirozzi, 92 N.J. 446, 456, 457 A.2d 431 (1983). Indeed, cross-examination is generally considered the most effective means of challenging a witness's credibility. Biunno, Current N.J. Rules of Evidence, comment 6 on N.J.R.E. 607 (1998-1999) (citing State v. Silva, 131 N.J. 438, 444, 621 A.2d 17 (1993)). Certainly, a witness's bias may affect credibility. State v. Gorrell, 297 N.J.Super. 142, 149, 687 A.2d 1016 (App. Div.1996). Again, while these questions were more in the nature of cheap theatrics, always with risk to the questioner, than clever cross-examination, they were within the bounds of cross-examination.
Other than its claim that this action was based upon design defect and did not include a failure-to-warn claim, defendant makes no argument that would support a claim that the judge abused his discretion in permitting the "warnings" questions to be asked. Though plaintiff's counsel conceded that he was not pursuing a warning claim, Howarth testified on direct examination, with no objection raised, that a flag would have warned plaintiff that the lower guard was not in place. Defendant does not object to this question here. Rather, defendant objects to a series of questions asked of Domeny on cross-examination. Defendant objected to all of these questions. However, defendant fails to mention that, except for a question pertaining to a warning in a manual that the user should support the wood being cut, none was ever answered following the objection. With respect to the question about the manual, the issue of properly supporting the wood was raised by Domeny on direct examination. Certainly, plaintiff's counsel was free to pursue that testimony on cross-examination. The judge did not abuse his discretion in permitting questions to be asked, which ultimately were never answered.
The questions that defendant claims lacked a "good faith basis" involved those which suggested that (1) "the accident occurred in a manner unsupported by the evidence" and (2) Domeny had a personal relationship with defense counsel. These claims are similarly without merit. First, the specific questions defendant objects to on appeal, which did not involve the suggestion that the accident occurred in a certain manner, were rephrased or were not objected to at all. Moreover, the questions pertained to plaintiff's counsel's exploration of Domeny's opinion, which was based upon his understanding of how the accident occurred. In addition, Domeny had acknowledged that a wood chip could have jammed the guard. With respect to the questions that "suggested" Domeny's opinion and investigation were really that of defense counsel, we conclude that, however tacky, they go to the issue of bias and credibility and were proper. There is no reason to reverse the judgment based upon plaintiff's counsel's cross-examination of Domeny.

4.
Defendant contends that the trial judge committed reversible error when he denied its motion for judgment at the close of all the evidence. In support of its contention, defendant argues that "reasonable minds could not conclude that plaintiff met his burden of proving a defect in Skil's product." In other words, "[b]ased on the evidence presented, reasonable minds could not conclude that the alternative designs *588 plaintiff offered would have made Skil's product safer."
On a motion for judgment under R. 4:40-1, the trial judge "must accept as true all evidence supporting the position of the non-moving party, according that party the benefit of all legitimate inferences that can be deduced from such evidence." Rena, Inc. v. Brien, 310 N.J.Super. 304, 311, 708 A.2d 747 (App.Div.1998). "If reasonable minds could differ, the court must deny the motion." Ibid. Whether this case is governed by the state-of-the-art defense or the risk-utility analysis, plaintiff was required to prove that a feasible and technologically practical alternative design would have made the Skilsaw safer. According to plaintiff's expert, the saw would have been safer if it had a blade brake or a safety flag. According to defendant's expert, a blade brake would have made the saw dangerous in other respects, and a flag handle would not have lasted. This was enough to get the matter to a jury. Lewis v. American Cyanamid, Co., 155 N.J. at 576, 715 A.2d 967. Thus, the judge did not commit reversible error when he denied defendant's motion.
Defendant takes issue with the specifics of plaintiff's proofs. For example, he challenges Howarth's use of the Ambitech brake on the grounds that no one uses it. Defendant's contention concerning the Ambitech brake is spurious.
First, Howarth had the Ambitech blade brake with him as an example of an electric brake that he could show the jury. Indeed, he refused to use the Ambitech brake with the saw because he did not "know the rating on this particular switch in comparison to the current on that particular saw" and because the brake and the saw must be designed together. Defense counsel expressly stated that he had no problem with Howarth's explaining the concept of a blade brake and showing the Ambitech device to the jury. Ultimately, defense counsel withdrew his objection to the demonstration of the blade brake with the Ambitech device though it appeared he did so only for purposes of moving the matter along for his schedule's sake.
Second, despite the lack of "proof" that the Ambitech brake was used by other saw manufacturers, it was undisputed that other circular saw manufacturers did use blade brakes of some kind. Howarth testified that "if not that one [Ambitech], a blade brake certainly could be designed into the saw, and has been in other saws." While he testified that other manufacturers used blade brakes, he never said that they used Ambitech brakes. Plaintiff's counsel acknowledged that the particular device could not be used on the Skilsaw.
Defendant also urges that reasonable minds could not "infer a defect from the custom of industry" because the evidence showed only that a few manufacturers used blade brakes, and plaintiff failed to show the risks and utility of the alternative design. Howarth testified that he could not envision any increased risk from the incorporation of a blade brake into a portable circular saw. He testified the utility of such a saw was it would stop the blade from spinning the moment the trigger was released.
Defendant also criticizes Howarth's interpretation of its data with respect to the failure of the switches. Defendant claims that Howarth misinterpreted the data. This was for the jury to determine. Clearly, defendant cannot criticize Howarth for relying upon defendant's own data. To say that Howarth relied upon surmise because he misinterpreted data is not the same as saying that Howarth relied upon surmise because he used no data.
Defendant's claim that there was "no factual basis for the jury to reasonably conclude that Mr. Howarth's accident reconstruction was accurate" is also rejected. The law merely requires that the opinion be stated in terms of probability. Malin v. Union Carbide Corp., 219 N.J.Super. 428, 439, 530 A.2d 794 (App.Div.1987). Howarth stated his opinion in terms of a probability. Although it could not have *589 been based upon direct evidence, the opinion was based upon the writings of others, including manufacturers of portable circular saws. Moreover, defendant's own expert agreed that a wood chip could have caused the accident. There was enough basis in Howarth's testimony for the defect issue to go to a jury. Lewis v. American Cyanamid Co., 155 N.J. at 576, 715 A.2d 967.

5.
Defendant next contends that it should have been permitted to raise a comparative negligence defense. Defendant argues that under Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 406 A.2d 140 (1979), comparative negligence remains a viable defense in a workplace setting so long as the plaintiff is not a factory worker who was injured while performing an assigned task on a factory machine. Defendant further argues that the Products Liability Act "did not address comparative fault principles and ... was not intended to alter Suter." Finally, defendant argues that we misinterpreted "the Legislature's intent and actions" in Tirrell v. Navistar Intern., Inc., 248 N.J.Super. 390, 591 A.2d 643 (App.Div.). Defendant asserts that it did not raise this issue at trial because the judge was bound to follow Tirrell v. Navistar Intern. Thus, defendant argues there would be no prejudice if this court exercised its original jurisdiction and considered the issue.
We usually do not consider issues raised for the first time on appeal unless they go to jurisdiction, are of great public importance, or involve plain error on the part of the trial court. R. 2:10-2; Scott v. Salerno, 297 N.J.Super. 437, 446-47, 688 A.2d 614 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997). Defendant does not address any of these factors. However, despite defendant's claim that it did not raise the issue below, prior to trial, the issue was raised before Judge Sweeney, who had granted plaintiff's motion in limine to bar defendant from putting on a comparative negligence defense. Moreover, we are interested in addressing this issue since we permitted amicus briefs.
In 1972, the Supreme Court of New Jersey considered whether the comparative negligence defense was applicable in a products liability case. Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972). In that case, John Bexiga, Jr., a minor, injured his hand while operating a punch press. Id. at 404, 290 A.2d 281. His father sued the manufacturer of the press on several grounds, including strict liability in tort. The machine had no safety devices that would have prevented John Jr.'s injuries. The plaintiff's expert testified that there were two devices available that would have prevented John Jr.'s accident.
The trial judge dismissed the action at the close of the plaintiff's case. We affirmed. The Supreme Court of New Jersey reversed.
One of the issues before the Supreme Court was whether John Jr. was contributorily negligent in the operation of the press. Ibid. In addressing this issue, the Court observed that "[c]ontributory negligence may be a defense to a strict liability action as well as to a negligence action." Id. at 412, 290 A.2d 281. Yet, the Bexiga Court held the defense inapplicable to the facts of that case because
The asserted negligence of plaintiff placing his hand under the ram while at the same time depressing the foot pedalwas the very eventuality the safety devices were designed to guard against. It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against.
[Ibid.]
In Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 386 A.2d 816 (1978), the Supreme Court expressly acknowledged the assumption of the risk defense in strict liability actions. There, the *590 plaintiff machine operator sued the manufacturer of a pelletizing machine for damages resulting from the loss of four of his fingers while operating the machine. Id. at 160, 386 A.2d 816. The machine in Cepeda had a guard that would have prevented the accident. Id. at 160-61, 386 A.2d 816. However, the guard had been removed. Id. at 161, 386 A.2d 816.
While the plaintiff knew that the guard had been removed, he had not removed it. Id. at 165, 386 A.2d 816. The defendant claimed that (1) it was not reasonably foreseeable that the machine would have been operated without the guard, and (2) the plaintiff was contributorily negligent in having operated the machine without the guard.
The jury awarded the plaintiff $125,000. We reversed the judgment entered in the plaintiff's favor, holding that the manufacturer could not be held responsible for the plaintiff's use of the machine without the guard, which we considered "`unforeseeable negligence'" on his part. Id. at 162, 386 A.2d 816 (quoting Cepeda v. Cumberland Engineering Company, Inc., 138 N.J.Super. 344, 351, 351 A.2d 22 (App.Div. 1976)). The Supreme Court reversed and remanded the matter for a new trial. Id. at 194, 386 A.2d 816.
After reviewing various strict liability cases in which contributory negligence either was or was not a valid defense, the Court stated that assumption of the risk was (1) a defense to strict liability in tort actions and (2) "conventionally expressed" as "contributory negligence, in its broad aspect." Id. at 183-85, 386 A.2d 816. The Supreme Court rejected the plaintiff's argument that Bexiga v. Havir Manufacturing Corp., 60 N.J. at 402, 290 A.2d 281, required the "rejection of the defense of contributory negligence, even in its limited assumption of risk aspect, as a matter of law." Id. at 186-87, 386 A.2d 816. The Court explained why John Jr. (in Bexiga, 60 N.J. at 402, 290 A.2d 281) had not assumed any risk:
The plaintiff was not unreasonable in working the machine; either he worked it `as is' or he had no job. There is no indication that the unsafety of the machine was known to him. He did not voluntarily expose himself to a known danger. His negligence, if any, was in the inadvertent contact with the foot pedalconduct characteristically not a bar under the contributory negligence distinction....
[Id. at 188, 386 A.2d 816.]
The Court further explained why a jury could have found that the plaintiff in Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. at 188, 386 A.2d 816, had assumed the risk:
The evidence here would permit a jury to find that plaintiff knew the purpose of the guard, knew it was off the machine when he came to work and also that he had been warned that he could be seriously injured if he worked the machine without the guard. The jury could also infer that plaintiff could have had the guard placed back on the machine by calling the attention of the foreman to the matter.
In short, the Cepeda Court was steadfast in its commitment to "the continuance of unreasonable voluntary exposure of oneself to a known danger as a defense to strict liability in tort." Id. at 189-90, 386 A.2d 816. One year later, Cepeda was reversed. Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 406 A.2d 140 (1979).
In Suter, the Supreme Court considered "the impact of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to 5.3, in strict liability actions." Id. at 153, 406 A.2d 140. In that case, the plaintiff, another machine operator, instituted an action for strict liability in tort against the defendant manufacturer of an industrial sheet metal rolling machine in which his hand was caught. Id. at 154, 406 A.2d 140. At trial, the judge charged the jury that the plaintiff "would be guilty of contributory negligence if he had not exercised that *591 degree of care which a reasonably prudent person would have exercised under the circumstances." Ibid. The jury found the plaintiff and the defendant equally at fault. After the verdict, the trial judge denied the plaintiff's motion to dismiss the contributory negligence defense and, applying the principles of comparative negligence, reduced the plaintiff's award by one-half.
The plaintiff appealed, and we modified the award to the whole amount of damages, holding that under Bexiga v. Havir Manufacturing Corp., 60 N.J. at 402, 290 A.2d 281, the contributory negligence defense was unavailable to the defendant. Id. 81 N.J. at 155, 406 A.2d 140. The Supreme Court affirmed and expressly reversed Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. at 152, 386 A.2d 816. Id. at 177, 406 A.2d 140.
In Suter, the plaintiff was injured when he accidently brushed against a gear lever, which activated the rollers on the machine, while attempting to remove something from the machine. Id. at 157, 406 A.2d 140. The plaintiff's expert testified that there were two methods available which would have prevented the accidental activation of the machine's rollers. Though the defendant's expert agreed with the plaintiff's, he testified that the accident occurred because the plaintiff had "placed himself in an unsafe position while reaching inside the cylinder without first cutting off the power to the machine." Ibid.
The Supreme Court began its analysis by reviewing the types of conduct that "may constitute contributory negligence in a strict liability suit." Ibid. The Court observed that contributory negligence is unavailable when the plaintiff merely failed to discover the product's defect or guard against the possibility of the defect's existence. The Court further observed that "generally where a plaintiff with actual knowledge of the danger presented by the defective product knowingly and voluntarily encounters that risk, a trial court should submit the defense of contributory negligence to the jury." Ibid. The Court distinguished assumption of the risk, as a defense, from a plaintiff's unintended and unforeseeable misuse of the product, which "sheds no light on whether the product is reasonably fit and safe for its intended or reasonably anticipated use." Id. at 159, 406 A.2d 140.
The Supreme Court held that "the Comparative Negligence Act is applicable to strict liability actions in those circumscribed areas in which plaintiff's conduct may be found to constitute contributory negligence." Id. at 164, 406 A.2d 140. After concluding that the plaintiff, who was intimately familiar with the machine, had operated it as many as a thousand times, was in charge of the operation, and was operating the machine carelessly would not be guilty of contributory negligence under Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. at 152, 386 A.2d 816, the Suter Court noted the anomaly: "Cepeda, who was operating the machine carefully, may be barred from recovery. Suter, though careless, cannot be." Id. at 166, 406 A.2d 140.
The Court continued:
It should not matter whether the manufacturer's duty is to prevent an employee from coming into contact with dangerous machine parts or to prevent an employee from accidentally setting a dangerous machine in motion. In the one instance, the risk is that the employee who knows the machine is or will accidentally get his hands caught in the machine and in the other that the employee will accidentally activate the machine, with the same consequences.
[Ibid.]
The Court concluded:
In our view an employee engaged at his assigned task on a plant machine, as in Bexiga, has no meaningful choice. Irrespective of the rationale that the employee may have unreasonably and voluntarily encountered a known risk, we hold as a matter of policy that such an employee is not guilty of contributory *592 negligence. Accordingly, we reject Cepeda's limitation of Bexiga to those cases where there was no `indication that the unsafety of the machine was known' to the employee. 76 N.J. at 188, 386 A.2d 816.
[Id. at 167, 406 A.2d 140 (some citations omitted).]
The Court explained its holding:
The imposition of a duty on the manufacturer to make the machine safe to operate whether by installing a guard or, as in Cepeda, by making it inoperable without a guard, means that the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect. The policy justification for Bexiga is sound. We see no reason to depart from Bexiga's elimination of contributory negligence where an employee is injured due to a defect (whether design or otherwise) in an industrial accident while using a machine for its intended or foreseeable purposes. The defendant manufacturer should not be permitted to escape from the breach of its duty to an employee while carrying out his assigned task under these circumstances when observance of that duty would have prevented the very accident which occurred.
[Id. at 167-68, 406 A.2d 140.]
Suter's holding was restated in Green v. Sterling Extruder Corp., 95 N.J. 263, 264, 471 A.2d 15 (1984), where Justice Clifford wrote:
Under the current state of our law in the strict liability context, contributory negligence in any of its varied forms (excluding, of course, any intentional or willful act) will not foreclose a factory worker who is injured while using a defective machine for a reasonably foreseeable purpose from recovering against the machine's manufacturer.
In 1987, the New Jersey Legislature passed the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -7, now N.J.S.A. 2A:58C-1 to -11. The act was not "intended to codify all issues relating to product liability, but only to deal with matters that require[d] clarification." N.J.S.A. 2A:58C-1(a).
The act did not alter the elimination of the contributory negligence defense to actions in which a factory worker was injured while using a machine for a reasonably foreseeable purpose. Cf. Johansen v. Makita USA, Inc., 128 N.J. 86, 94-95, 98, 607 A.2d 637 (1992). However, evidence pertaining to the plaintiff's use of the product was admissible to show that plaintiff's conduct, rather than any defect in the product, was the proximate cause of the accident. Id. at 103, 607 A.2d 637.
By 1993, our Supreme Court continued to recognize that a plaintiff's comparative fault in cases where the plaintiff was injured in the workplace "while using a machine in a reasonably foreseeable manner" remained "irrelevant." Jurado v. Western Gear Works, 131 N.J. 375, 379, 387, 619 A.2d 1312 (1993) (plaintiff-employee's hand injured in machine at work). In the meantime, however, we had expressly recognized that Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 150, 406 A.2d 140, should not be limited to plaintiffs who were working (1) in a factory (2) at an assigned task (3) on a plant machine.
In Crumb v. Black & Decker (U.S., Inc.), 204 N.J.Super. 521, 523, 499 A.2d 530 (App.Div.), certif. granted, 102 N.J. 386, 508 A.2d 247 (1985), appeal dismissed, 104 N.J. 432, 517 A.2d 425 (1986), for example, the plaintiff cut into his leg with a circular saw, which was almost twenty years old, while sawing branches at the direction of his employer. The saw did not belong to the employer. It belonged to the plaintiff, who had brought it from home. The saw had a protective guard which was supposed to cover the blade as the saw was withdrawn. After the plaintiff was injured, he discovered that the guard had not closed on that particular cut.
*593 The plaintiff's expert testified that the guard failed to close because the guard's spring had wedged itself. The defendant's expert testified that the spring had been wedged intentionally. He also testified that the plaintiff was using the wrong type of saw for the task and that he handled the saw in a dangerous manner. The plaintiff was sitting on the ground cross-legged while he was cutting.
One of the special verdict interrogatories asked whether the plaintiff "`voluntarily and unreasonably encounter[ed] a known risk in handling the machine in the way that he did.'" Id. at 526, 499 A.2d 530. The "risk" referred to "sitting cross-legged and cutting logs in the immediate proximity of his thigh." Id. at 527, 499 A.2d 530. The jury answered "yes." Id. at 526, 499 A.2d 530. Ultimately, the plaintiff's complaint was dismissed because the jury found him sixty percent responsible for the accident. We vacated the dismissal.
Though we vacated the dismissal, we disagreed with the plaintiff's blanket assertion that under Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 150, 406 A.2d 140, "his conduct should not be assessed at all since he was engaged in an employment task at the time of his injury." Id. at 527, 499 A.2d 530. We said: "The test of Suter is not simply whether plaintiff was injured while performing a task in the course of his employment. Such is a workers' compensation standard, not that applied in a products liability case." Ibid.
After quoting Suter's holding, we stated that the "essence of the Suter rule is that the employee had no meaningful choice." Ibid. "He either worked at his assigned task or was subject to discipline or being labelled as a troublemaker." Ibid. Ultimately, we did not reach the "meaningful choice" issue because the plaintiff had chosen to use his own saw. Id. at 528, 499 A.2d 530. Nonetheless, we found that the plaintiff was not contributorily negligent because the guard "was designed to protect against the precise inadvertent motion that resulted in plaintiff's accident, i.e., one that would bring an unguarded blade in contact with the user." Ibid.
Since Crumb we have continued to state the Suter holding in broader terms. Grier v. Cochran Western Corp., 308 N.J.Super. 308, 324, 705 A.2d 1262 (App.Div.1998) ("a plaintiff who sustains an injury from a defective product in a work setting will not have his or her recovery diminished under comparative negligence principles for having allegedly encountered a known risk"); Congiusti v. Ingersoll-Rand Co., 306 N.J.Super. at 134, 703 A.2d 340 ("no question that the comparative negligence of a plaintiff is generally disregarded in a workplace setting"); Fabian v. Minster Mach. Co., Inc., 258 N.J.Super. at 278, 609 A.2d 487 (comparative negligence not applicable where employee is injured at "workplace task"); Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 390, 591 A.2d 643.
In Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 394, 591 A.2d 643, Walter Tirrell was killed when a tractor-trailer ran over him while backing up. At the time of the accident, Tirrell and a co-worker were talking to their foreman at a jobsite where they had recently arrived. The tractor-trailer was delivering a backhoe the co-worker was to operate and Tirrell was to maintain.
Tirrell's widow instituted a product liability action against the manufacturer of the tractor-trailer. She claimed the tractor-trailer was defectively designed; the manufacturer had failed to install a backup signal. The jury awarded her more than $2 million. The manufacturer appealed.
The witnesses agreed that the tractor-trailer had blind spots. Plaintiff's expert testified that a tractor-trailer with blind spots could be backed up safely only if there were a signal person or a distinctive audible alarm. There was no signal person observing the tractor-trailer at the time of the accident. The type of alarm *594 described by plaintiff's expert had been available for thirty years, would not have affected the tractor-trailer's utility, and was both inexpensive and easy to install.
On appeal, the defendant contended that it was not subject to the Suter ban on the employee's comparative negligence defense because Tirrell "was neither responsible for nor directly concerned with the operation of the trailer." Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 399-400, 591 A.2d 643. We rejected the defendant's contention.
In rejecting the defendant's contention in Tirrell that Suter had limited the "employee exception" to the comparative negligence defense to "`an employee engaged at his assigned task on a plant machine,'" Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 400, 591 A.2d 643 (citing Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 167, 406 A.2d 140), we first referred to the following Assembly and Senate Statements accompanying the Act: "In particular, sections 2 through 4 are not intended to affect the holding in [Suter], with respect to the application of the principle of comparative fault in cases involving workplace injuries." Ibid. Accordingly, "by the Legislature's use of the term `workplace injuries,' any limitation of the Suter principle to a factory setting would now clearly be inappropriate." Id. at 401, 591 A.2d 643.
We also considered and rejected the question of whether a plaintiff should "continue to be absolved from a workplace injury when he voluntarily and unreasonably encounters a known risk." Ibid. Although resolution of this question was "less clear from the text of the Act," we noted in Tirrell that "the Committee Statements indicate that the Legislature did not want to change the comparative fault rules of Suter." Ibid. We continued:
Furthermore, in Crumb, we interpreted the Suter principle:
The essence of the Suter rule is that the employee had no meaningful choice. He either worked at his assigned task or was subject to discipline or being labelled as a troublemaker.
204 N.J.Super. at 527, 499 A.2d 530. It is true that had decedent known that there was no back-up alarm on the trailer, he could have refused to work on the job. But, as we noted in Crumb, such action could subject him to disciplinary action or other adverse consequences. He had no meaningful choice.
[Ibid.]
In Tirrell, we skirted the assumption of risk issue by noting that a back-up alarm "was not meant to warn an attentive worker" but instead "was meant to attract the attention of inattentive persons in the area of the danger." Id. at 401-02, 591 A.2d 643. We concluded:
Even if decedent had known that he was working with a trailer without a back-up alarm, and the Suter employer comparative fault rule were inapplicable, it would be against public policy, as expressed in Bexiga, Suter, and their progeny, for decedent to be barred by a finding that he proceeded in the face of a known danger under the circumstances of this case.
[Id. at 402, 591 A.2d 643.]
Other decisions have permitted plaintiffs to recover without a bar for injuries that occurred in non-factory workplace settings even though they were not performing an assigned task on a factory machine. Consider, for example, Mettinger v. W.W. Lowensten, Inc., 292 N.J.Super. 293, 678 A.2d 1115 (App.Div.1996), aff'd, 153 N.J. 371, 709 A.2d 779 (1998). In that case, the plaintiff-employee lacerated his hand when, as he was emptying a trash can, he slipped and lost his balance. Id. at 301, 678 A.2d 1115. "Instinctively, he reached out with his right arm to grab something to steady himself." Ibid. That "something" turned out to be an operating slicing machine. Ibid. We observed that the trial judge properly declined to give a comparative negligence charge to the jury because *595 comparative negligence "is not applicable to a workplace setting where the worker has no meaningful choice." Id. at 312, 678 A.2d 1115.
In Grier v. Cochran Western Corp., 308 N.J.Super. at 313-14, 705 A.2d 1262, the plaintiff-employee was injured when he stepped off a conveyor belt leading from the cargo hold of a plane and fell thirteen to fourteen feet below. At the time of the accident, the belt's guardrail was not in the raised position. We held that the trial judge properly instructed the jury that the "plaintiff's conduct was irrelevant to the question of whether the product was defective, and that plaintiff's conduct was to be considered only on the issue of proximate cause." Id. at 325, 705 A.2d 1262.
Although defendant correctly asserts that the Products Liability Act did not alter Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 150, 406 A.2d 140, its assertion that the comparative negligence defense is precluded only when the employee is a factory worker who was injured while performing an assigned task on a machine on the shop floor too narrowly construes Suter and ignores what the Crumb v. Black & Decker (U.S., Inc.), 204 N.J.Super. at 521, 499 A.2d 530, court described as "the essence" of Suter`s holding, namely "that the employee had no meaningful choice." Indeed, the Suter Court did not limit its holding to factory workers who are injured during an "assigned task on a plant machine." Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 167, 406 A.2d 140.
In Suter the Supreme Court expressly left open the possibility that there would be "other situations wherein an employee may similarly be held to have had no meaningful choice." Id. at 167 n. 5, 406 A.2d 140. Indeed, it would be ludicrous to allow a factory employee to recover but not a construction worker solely because the former works inside a building on the factory floor. It would be equally ludicrous and unjust to permit an employee to recover for injuries sustained by a freestanding, stationary machine but not by a hand-held saw. Of course, the essence of Suter is whether the employee had a meaningful choice. Therefore, the holding in Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 390, 591 A.2d 643, is consistent with Suter which cannot be read to apply only to factory workers injured while performing assigned tasks on factory machines on the factory floor. Defendant's claim that the Crumb panel ruled that "comparative fault was a defense to an employee's claim because he was hurt in a non-factory workplace" is simply inaccurate.
We conclude Tirrell is consistent with Suter, and plaintiff should not be barred from recovery solely because he did not work in a factory. In short, Suter is not "disturbed" by Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 390, 591 A.2d 643. Tirrell represents the movement of Suter to the next logical step, which was left open in footnote 5 of the opinion.
However, defendant offered evidence that the Skilsaw had been purposely wedged open. This evidence goes beyond mere negligence. Indeed, the wedging theory presented by defendant goes to an intentional act on the part of plaintiff that would have created the very situation that gave rise to the accident. Plaintiff testified that he knew about wedging open the lower guard. In other words, had plaintiff wedged open the lower guard, he would have voluntarily proceeded to encounter a known riska risk he had purposely created. This type of conduct is not exempted by Suter or Tirrell. However, defendant's argument does not seem to be based upon a knowing and voluntary assumption of the risk. Instead, it appears to be based upon plaintiff's negligence and defendant's desire to have fault apportioned between the parties even though defendant, at one point, mentions plaintiff's assumption of the risk. While plaintiff's alleged wedging of the guard, if proven, would have constituted misuse of the product on plaintiff's part, the misuse was obviously *596 foreseeable to defendant inasmuch as Domeny testified that he had seen workers wedge open lower guards. Yet, misuse goes to the issue of proximate cause, a jury charge defendant does not challenge. Jurado v. Western Gear Works, 131 N.J. at 389, 619 A.2d 1312.
The judge properly refused to give the jury a comparative negligence charge based upon plaintiff's conduct. Whether he should have given an assumption of the risk charge is not at issue and, in any event, the charge would have been based upon plaintiff's misuse of the product, which really goes to the issue of proximate cause.

6.
Defendant contends that the Tirrell decision violates the separation of powers clause of the New Jersey Constitution, as well as the due process and equal protection clauses of the New Jersey and United States Constitutions. This issue was not raised below.
Defendant argues that the Comparative Negligence Act "gave product manufacturers the right to assert this defense in all product liability actions," yet the Tirrell decision "usurped the Legislature's function and violated the Separation of Powers Clause of the New Jersey Constitution" when it "struck the comparative negligence defense in all workplace settings." The usurpation of the Legislature's function in turn deprived defendant of its property rights without due process as required by the United States Constitution. Thus, the Tirrell panel, according to defendant, violated the New Jersey and United States Constitutions.
According to defendant, the Comparative Negligence Act, which was adopted in 1973, provided that a plaintiff's own negligence would not bar his or her recovery in a negligence action unless the plaintiff's negligence were greater than the defendant's. Defendant notes the Suter Court's use of the word "negligence" in the decision. Indeed, the Suter Court expressly held that "the Comparative Negligence Act is applicable to strict liability actions in those circumscribed areas in which plaintiff's conduct may be found to constitute contributory negligence." Suter v. San Angelo Foundry & Machine Co., 81 N.J. at 164, 406 A.2d 140. But, defendant overlooks the Suter Court's recognition that "the nature of that contributory negligence is sharply circumscribed." Id. at 158, 406 A.2d 140. Indeed, the defense is available only when the plaintiff "with actual knowledge of the danger presented by the defective product knowingly and voluntarily encounters that risk." Ibid. Thus, comparative negligence has always remained alive and well in strict liability actions, albeit in a restricted fashion.
Defendant is of the mistaken belief that Tirrell, "ruled that ... comparative negligence must be barred in all workplace settings." To the contrary, the court there expressly stated that such a ruling "would require us to reconsider the Suter rule, an action which the court has shunned since 1979." Tirrell v. Navistar Intern., Inc., 248 N.J.Super. at 401, 591 A.2d 643. Because Tirrell did not "[e]liminat[e] comparative negligence in all workplace settings," defendant's argument that it has been deprived of a property interest without due process falls.
For the same reasons, defendant's equal protection argument is also rejected; it rests upon the same faulty premise. In addition, it should be axiomatic that, unless a product manufacturer can prove otherwise, an employee really has no meaningful choice when asked by the employer to perform a task, whether indoors or outdoors, with a machine or piece of equipment belonging to the employer.
Amicus Curiae Product Liability Advisory Council, Inc. (Council) argues that the 1995 amendments to the Comparative Negligence Act, N.J.S.A. 2A:15-5.2 to 5.8, which expressly included strict liability actions within the types of actions subject to the comparative negligence defense, *597 requires the reconsideration of Suter. The Council's argument is without merit. First, the amended statute applies only to causes of actions filed on or after June 29, 1995. L.1997, c. 90 § 2; L.1995, c. 140, § 3. This action was filed in 1992. Second, although the Suter Court spoke in terms of comparative negligence, the exception that it carved out in strict liability actions did not involve comparative negligence at all. Instead, the exception pertained to a plaintiff's voluntary assumption of a known risk, which does not involve negligence. Lewis v. American Cyanamid Co., 155 N.J. at 558-59, 715 A.2d 967 (comparative negligence requires a showing that plaintiff "voluntarily and unreasonably encountered [a] known risk").
The Council also argues that Suter was an "ambivalen[t]" decision and that it "diverges from the mainstream of modern jurisprudence." Regardless, Suter remains controlling law in New Jersey, Lewis v. American Cyanamid Co., 155 N.J. at 558-59, 715 A.2d 967, and may only be modified or rejected by our highest Court.
Affirmed.